******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# LAURA GRABE *v.* JUSTIN HOKIN
## (SC 20432)

Robinson, C. J., and McDonald, D'Auria,
Kahn, Ecker and Keller, Js.

*Syllabus*

The plaintiff sought to dissolve her marriage to the defendant and to enforce
a nuptial agreement that the parties had executed shorty before their mar-
riage. The prenuptial agreement provided that, in the event of dissolu-
tion, the parties agreed to waive any claim to each other's separate
property or to support from the other. The agreement also provided
that a party who unsuccessfully challenged its enforceability would pay
the attorney's fees of the other party and contained a severability clause
providing that, if any provision or provisions in the agreement were
found to be unenforceable, the remainder of the agreement would con-
tinue in full force and effect. The defendant filed a cross complaint,
claiming that enforcement of the agreement would be unconscionable
in light of certain, uncontemplated events during the marriage, including
the birth of the parties' three children, the destruction of the defendant's
house by fire, the destruction of a yacht club, in which the defendant
had an indirect ownership interest, due to a natural disaster, and the
failure of a business from which the defendant derived his primary
source of income. The trial court found that, although these events were
not contemplated, they did not render enforcement of the agreement
unconscionable. The court found, however, that enforcement of the
attorney's fees provision would be unconscionable insofar as it would
financially cripple the defendant. The trial court rendered judgment
dissolving the parties' marriage, striking the attorney's fees provision
from the prenuptial agreement and concluding that the remainder of
the agreement was enforceable. The defendant appealed, claiming that
the trial court incorrectly determined that the occurrence of the uncon-
templated events during the parties' marriage did not render enforce-
ment of the agreement unconscionable at the time of dissolution. *Held*
that the trial court correctly determined that enforcement of the parties'
prenuptial agreement was not unconscionable in light of all of the rele-
vant facts and circumstances: the fact that events arose during the
marriage that were beyond the parties' initial contemplation did not
establish that enforcement of the prenuptial agreement would be uncon-
scionable, and, although the defendant claimed that the children were
entitled to continue the lifestyle to which they were accustomed before
the dissolution, the children were being supported by the plaintiff at
the same standard of living they enjoyed before the dissolution, the
defendant conceded that, as a noncustodial parent, he was not entitled
to child support, and there was nothing in this state's statutes or case
law to suggest that public policy required that a noncustodial parent
receive postdissolution support for the sole purpose of ensuring that
he or she has the ability to provide for the children of the marriage in
the same manner as the custodial parent, as a regulation (§ 46b-215a-
5c (b) (6) (B)) setting forth the criteria for deviating from this state's
child support guidelines expressly contemplates that, after dissolution,
parents may have an extraordinary disparity in income; moreover, the
defendant had significant assets at the time of the dissolution, nothing
in the record supported the conclusion that he was incapable of earning
an income, it was not unreasonable to expect the defendant to obtain
employment to replace the income that he lost from the failed business,
and there was no evidence that the defendant gave up any income
earning opportunities as a result of his marriage or the births of the
children, or that he made significant contributions to family life, for
which it would be unfair not to compensate him; furthermore, it was
not inconsistent for the trial court to conclude that it would be uncon-
scionable to enforce the attorney's fees provision in the agreement on
the ground that enforcement of that provision would financially cripple
the defendant while also finding the remainder of the agreement enforce-
able, as the agreement's severability clause contemplated the possibility

of enforcement of certain provisions in the agreement but not others.

Argued May 3—officially released November 17, 2021*

*Procedural History*

Action for the dissolution of a marriage, and for other relief, brought to the Superior Court in the judicial district of Stamford-Norwalk, where the defendant filed a cross complaint; thereafter, the case was referred to the Regional Family Trial Docket at Middletown and tried to the court, *Diana, J.*; judgment dissolving the marriage and granting certain other relief, from which the defendant appealed. *Affirmed.*

*Scott T. Garosshen*, with whom were *Kenneth J. Bartschi* and, on the brief, *Michael T. Meehan*, for the appellant (defendant).

*Charles D. Ray*, with whom were *Angela M. Healey*, *David W. Griffin* and, on the brief, *Dyan M. Kozaczka*, for the appellee (plaintiff).

*Opinion*

KAHN, J. The issue before us in this appeal is whether the trial court correctly determined that the enforcement of a prenuptial agreement executed by the plaintiff, Laura Grabe, and the defendant, Justin Hokin, was not unconscionable at the time of the dissolution of their marriage. Shortly before the parties' marriage in 2010, they executed a prenuptial agreement in which each party agreed, in the event of a dissolution action, to waive any claim to the other's separate property, as defined in the agreement, or to any form of support from the other, including alimony. The agreement also provided that a party who unsuccessfully challenged the enforceability of the agreement would pay the attorney's fees of the other party. In 2016, the plaintiff brought this action seeking dissolution of the marriage and enforcement of the prenuptial agreement. The defendant filed a cross complaint in which he claimed, inter alia, that the agreement was unenforceable because it was unconscionable at the time of the dissolution under General Statutes § 46b-36g (a) (2).[1] After a trial to the court, the court concluded that, with the exception of the attorney's fees provision, enforcement of the terms of the prenuptial agreement that the parties entered into was not unconscionable, even in light of certain events that had occurred during the marriage. Accordingly, the trial court rendered judgment dissolving the marriage and enforcing the terms of the prenuptial agreement, with the exception of the provision requiring the party who unsuccessfully challenged the enforceability of the agreement to pay the attorney's fees of the other party. On appeal,[2] the defendant contends that the trial court incorrectly determined that the occurrence of the unforeseen events found by the trial court did not render the enforcement of the entire agreement unconscionable at the time of the dissolution. We affirm the judgment of the trial court.

The record reveals the following facts that were found by the trial court or that are undisputed. Shortly before the parties' marriage on October 2, 2010, they entered into a prenuptial agreement. The agreement provided that it would be "governed and construed in accordance with the Connecticut Premarital Agreement Act, [General Statutes] § 46b-36a et seq. . . ." Under the agreement, each party waived any claim to the property of the other during the marriage. In the event of a marital dissolution, each party agreed to waive "all claims and rights to any equitable distribution of [s]eparate [p]roperty [of the other party, as defined in the agreement]," and to "any claim for temporary or permanent maintenance, support, alimony, [attorney's] fees (including [pendente] lite [attorney's] fees) or any similar claim . . . ." In addition, each party agreed that, if either party "unsuccessfully seeks to invalidate all or any portion of [the] [a]greement or seeks to recover

alimony (other than pendente lite [attorney's] fees) or property in a manner which deviates from the terms of [the] [a]greement, then the prevailing party shall be entitled to recover all reasonable and necessary [attorney's] fees and other costs incurred in successfully defending his or her rights under [the] [a]greement." The agreement also contained a severability provision stating that, "[i]n case any provision of [the] [a]greement should be held to be invalid, such invalidity shall not affect, in any way, any of the other provisions herein, all of which shall continue in full force and effect, in any country, state or jurisdiction in which such provisions are legal and valid." In addition, the agreement provided that "[n]o change in circumstances of the parties shall render [the] [a]greement unconscionable if enforcement hereof is sought at any time in the future."

At the time that the parties executed the prenuptial agreement, the plaintiff's annual income was $1,312,225, and her net worth was $12,319,380. The defendant's estate had a fair market value of $5,150,295,[3] and he disclosed income of $97,719.06 over the previous six months. The primary sources of the defendant's income were a director's fee of approximately $60,000 per year from an entity known as Intermountain Industries and guaranteed payments ranging from $80,000 to $100,00 per year from an entity known as 4H, LLC Family Partnership (4H, LLC).[4] The defendant received no other income from employment.

Before their marriage, both the plaintiff and the defendant would frequently stay out all night socializing and drinking with friends. The plaintiff changed her behavior when she became pregnant shortly after the marriage, but the defendant did not. After the parties' oldest daughter was born in late 2011, the defendant continued to neglect his responsibilities to his family. For example, ten months after his daughter's birth, the defendant left the plaintiff at home alone with her while Hurricane Sandy struck their neighborhood, and the plaintiff was forced to seek shelter at her parents' home.

After the parties' second daughter was born in 2013, the defendant's family planned an intervention for him, as his drinking was out of control and he was being completely unproductive. The intervention never occurred, and the defendant continued to stay out all night, sleep most of the day and ignore the needs of his wife and children.

In August, 2014, the plaintiff contacted a divorce lawyer. Two weeks later, the house in Norwalk where the parties resided, which the defendant owned, was completely destroyed by a fire. The parties then leased another residence in Norwalk. In November, 2014, the plaintiff filed an action for the dissolution of the marriage, but she later withdrew it. In 2015, the parties' third daughter was born.

During this period, the plaintiff started building a house in the Rowayton neighborhood of Norwalk. In March, 2016, the plaintiff separated from the defendant and moved into the Rowayton house with their three young daughters. Several weeks later, she filed this action seeking the dissolution of the marriage and enforcement of the prenuptial agreement. In February, 2017, the defendant filed an amended answer and cross complaint, alleging, inter alia, that the prenuptial agreement was unenforceable under § 46b-36g (a) (2) because it was unconscionable when enforcement was sought.[5]

Thereafter, in September, 2017, a yacht club in the Caribbean known as the Bitter End Yacht Club (Yacht Club), which was owned by the defendant's family and in which the defendant had an indirect, fractional ownership interest, was destroyed by Hurricane Irma. Also in 2017, Intermountain Industries failed due to a downturn in the price of crude oil. As a result, it no longer paid the defendant a director's fee, and its guaranteed payments to 4H, LLC were discontinued.

Evidence presented at trial showed that, since the execution of the prenuptial agreement, the defendant's assets had decreased in value from $5,150,295 to $2.1 million. A note on the defendant's financial affidavit dated February 11, 2019, which was introduced as an exhibit at trial, indicated that $1,845,000 of these assets were held in the Justin Hokin Grantor Trust, representing the trust's ownership interests in other assets, "primarily [4H, LLC]," and that "[t]he most significant asset in [4H, LLC], is [the Yacht Club], which was destroyed by Hurricane Irma in the summer of 2017." The note also indicated that the trust was "wholly illiquid" and that its value was not "accessible" to the defendant. The defendant had liabilities of $1,351,262, more than $1 million of which was debt owed to his father and to 4H, LLC, for "legal fees . . . ." The affidavit showed that the defendant had no significant income.[6]

The defendant contended in his posttrial brief to the trial court that the births of the parties' three children, the destruction of his house by fire, the destruction of the Yacht Club by Hurricane Irma and the failure of Intermountain Industries were not contemplated when the prenuptial agreement was signed and that enforcement of the agreement would be unconscionable in light of these unforeseen events. Accordingly, the defendant requested that the trial court not enforce the agreement and, instead, order a property division "[that] . . . would permit the defendant to purchase a home in close proximity [to the plaintiff's home] to provide the minor children a comparable quality of life between both parent households."

The plaintiff contended before the trial court that, to the contrary, the events cited by the defendant were

not beyond the contemplation of the parties when they executed the prenuptial agreement. She also referred to evidence presented at trial that would support findings that, after the defendant received insurance proceeds for the destruction of his house, paid off two mortgages on the house and sold the land, he retained net proceeds of $775,587.73, as compared with equity of $20,309.58 at the time that the prenuptial agreement was executed; the value of the Yacht Club property on December 31,2017, was $14,900,000, $3,000,000 more than its value on the date that the prenuptial agreement was executed; and the defendant's family was responsible for the failure of Intermountain Industries. Accordingly, the plaintiff argued that, even if the events were not contemplated, it would not be unconscionable to enforce the prenuptial agreement, in part because it would be unfair to require the plaintiff bear the burden of the defendant's neglectful and unproductive behavior.

In its memorandum of decision, the trial court found that, at the time of trial, the plaintiff was forty-one years old and in good health. She had a bachelor's degree in journalism and was two credits short of receiving her master's degree in science from New York University. She had a net weekly income of $34,284,[7] and the fair market value of her assets was $27.4 million. The defendant was forty-four years old and in good health. He had a bachelor's degree in geography from the University of Montana. He had no significant income[8] and his assets had a fair market value of $2.1 million.[9]

The trial court determined that the defendant was at fault for the breakdown of the marriage. The court observed that, after the parties' three children were born, "the defendant continued to live a life full of drinking and partying. Instead of trying to provide for the plaintiff and their young children, the defendant remained stagnant and engulfed in a selfish mentality until he lost his footing in his business and his marriage." The marriage "suffered as the defendant slept most of the day, stayed out all night, and did not make the plaintiff or the children even a remote priority in his life."

The trial court further found that, at the time that they entered into the prenuptial agreement, the parties had not contemplated that they would have three children, the defendant's house would be destroyed by fire, the Yacht Club would be destroyed by a hurricane and that Intermountain Industries would fail, depriving the defendant of his primary source of income.[10] Although the court concluded that these events were not specifically contemplated by the parties when they entered into the agreement, it determined that they were not events that would render enforcement of the terms of the agreement unconscionable.

When it came to the enforcement of the attorney's fees provision, however, the trial court concluded that,

under the circumstances existing at the time of trial, enforcement of that provision would be unconscionable. The court observed that the plaintiff "has great financial wealth and [was] not incapable of paying for her own attorney's fees." In addition, the court found it "unlikely that the parties considered paying millions of dollars in attorney's fees to the other party in the event of a marital dissolution" and that the enforcement of the attorney's fees provision "would financially cripple the defendant's remaining assets . . . ."[11] In light of these findings, the court concluded that, "while the totality of the agreement is not unconscionable, [the provision requiring a party who unsuccessfully challenges the prenuptial agreement to pay the attorney's fees of the other party] is unconscionable and should be stricken from the antenuptial agreement. The remainder of the parties' antenuptial agreement shall be enforced . . . ." Accordingly, the trial court rendered judgment dissolving the parties' marriage, striking the attorney's fees provision from the prenuptial agreement and, consistent with the severability provision of the agreement, concluding that the remainder of the agreement was enforceable. The court also incorporated the final parenting plan into the judgment, pursuant to which the children were to reside primarily with the plaintiff but would spend time with defendant pursuant to a regular visitation schedule. In addition, the parties stipulated that the defendant would pay weekly child support in the amount of $57, in accordance with the child support guidelines. Thus, although the parties had joint legal custody of the children, the plaintiff was to have primary physical custody.

This appeal followed.[12] On appeal, the defendant contends that the trial court incorrectly determined that it would not be unconscionable to enforce the prenuptial agreement when it found that the parties did not initially contemplate that the defendant would be helping to raise three young children at a time when he had no income and greatly diminished assets.[13] The plaintiff contends that, even if the parties did not initially contemplate these events, the trial court correctly determined that they were not so far beyond their contemplation as to render the enforcement of the agreement unconscionable.[14] We agree with the plaintiff.

We begin our analysis with the standard of review. Pursuant to § 46b-36g (a), "[a] premarital agreement . . . shall not be enforceable if the party against whom enforcement is sought proves that . . . (2) [t]he agreement was unconscionable when it was executed or when enforcement is sought . . . ." Whether the prenuptial agreement is enforceable is a mixed question of fact and law. See *Friezo* v. *Friezo*, 281 Conn. 166, 180–81, 914 A.2d 533 (2007), overruled in part on other grounds by *Bedrick* v. *Bedrick*, 300 Conn. 691, 17 A.3d 17 (2011). Although the underlying historical facts found by the trial court may not be disturbed unless

they are clearly erroneous; see *Kovalsick* v. *Kovalsick*, 125 Conn. App. 265, 270–71, 7 A.3d 924 (2010); whether a prenuptial agreement is unconscionable in light of those facts, if not clearly erroneous, is a question of law subject to plenary review. See *Crews* v. *Crews*, 295 Conn. 153, 163–64, 989 A.2d 1060 (2010); see also General Statutes § 46b-36g (c) ("[a]n issue of unconscionability of a premarital agreement shall be decided by the court as a matter of law").

"Unconscionable is a word that defies lawyer-like definition. . . . The classic definition of an unconscionable contract is one which no [individual] in his senses, not under delusion, would make, on the one hand, and which no fair and honest [individual] would accept, on the other." (Internal quotation marks omitted.) *Beyor* v. *Beyor*, 158 Conn. App. 752, 758, 121 A.3d 734, cert. denied, 319 Conn. 933, 125 A.3d 206 (2015).

We have previously recognized that § 46b-36g was intended to endorse, clarify and codify the standards set forth in this court's decision in *McHugh* v. *McHugh*, 181 Conn. 482, 436 A.2d 8 (1980). See, e.g., *Friezo* v. *Friezo*, supra, 281 Conn. 185–86 n.23. In *McHugh*, this court held that "an antenuptial agreement will not be enforced where the circumstances of the parties at the time of the dissolution are so far beyond the contemplation of the parties at the time the agreement was made as to make enforcement of the agreement work an injustice. . . . Thus, where a marriage is dissolved not because it has broken down irretrievably, but because of the fault of one of the parties, an antenuptial waiver of rights executed by the innocent party may not be enforceable, depending [on] the circumstances of the particular case and the language of the agreement. . . . Likewise, where the economic status of [the] parties has changed dramatically between the date of the agreement and the dissolution, literal enforcement of the agreement may work injustice." (Citations omitted.) *McHugh* v. *McHugh*, supra, 489. Other unforeseen changes that may, depending on the circumstances, render a prenuptial agreement unenforceable include the birth of a child, loss of employment or a move to another state. *Bedrick* v. *Bedrick*, supra, 300 Conn. 706.

"Absent such unusual circumstances, however, antenuptial agreements freely and fairly entered into will be honored and enforced by the courts as written." *McHugh* v. *McHugh*, supra, 181 Conn. 489. "Unfairness or inequality alone does not render a [prenuptial] agreement unconscionable;[15] spouses may agree on an unequal distribution of assets at dissolution. [T]he mere fact that hindsight may indicate the provisions of the agreement were improvident does not render the agreement unconscionable. . . . Instead, the question of whether enforcement of an agreement would be unconscionable is analogous to determining whether enforcement of an agreement would work an injustice. . . .

Marriage, by its very nature, is subject to unforeseeable developments, and no agreement can possibly anticipate all future events." (Citations omitted; footnote added; internal quotation marks omitted.) *Bedrick* v. *Bedrick*, supra, 300 Conn. 705–706. Indeed, if every event that the parties did not anticipate could provide a basis for invalidating a prenuptial agreement, no such agreement would be enforceable. Thus, "the party seeking to challenge the enforceability of the antenuptial contract bears a heavy burden." *Crews* v. *Crews*, supra, 295 Conn. 169; see id., 170 ("proving uncontemplated, dramatically changed circumstances requires a significant showing"); see also id. ("*McHugh* requires an extraordinary change in economic status and . . . the threshold for finding such a dramatic change is high" (internal quotation marks omitted)).

In the present case, we assume without deciding that the trial court correctly found that the parties did not contemplate the births of their three children, the destruction of the defendant's house by fire, the destruction of the Yacht Club by a hurricane or the failure of Intermountain Industries when they entered into the prenuptial agreement.[16] We further assume that the resulting diminishment in the value of the defendant's assets and his loss of income from Intermountain Industries also were not contemplated. As we explained, however, it is clear under our case law that, standing alone, the fact that existing circumstances were beyond the parties' initial contemplation does not establish that enforcement of a prenuptial agreement would be unconscionable. Rather, we must determine whether these circumstances were "so far beyond the contemplation of the parties at the time the agreement was made as to make enforcement of the agreement work an injustice." *McHugh* v. *McHugh*, supra, 181 Conn. 489; see also *Crews* v. *Crews*, supra, 295 Conn. 168 (if court determines that circumstances at time of dissolution were beyond parties' initial contemplation, court must then determine "whether enforcement would cause an injustice"). In making this determination, we must consider all of the relevant facts and circumstances. See, e.g., *Crews* v. *Crews*, supra, 163.

We first address the defendant's contention that the trial court improperly failed to recognize that enforcement of the prenuptial agreement would be unconscionable in light of the uncontemplated births of the parties' children and his loss of assets and income because the "children are entitled to continue the lifestyle to which [they were] accustomed and the standard of living [they] enjoyed before the divorce . . . ."[17] (Internal quotation marks omitted.) *Hornung* v. *Hornung*, 323 Conn. 144, 162, 146 A.3d 912 (2016). We are not persuaded. There is no question in the present case that the children are being supported by the plaintiff at the same standard of living that they enjoyed before the dissolution. As far as the record reveals, they continue

to live in the same house, to sleep there most nights, to attend the same schools, to receive the same level of health care and to enjoy the same food, clothing, vacations, entertainment and the like as they did before the marital dissolution. Thus, it is difficult to perceive the relevance of *Hornung* in the present case. Contrary to the defendant's suggestion, the fact that a child spends a limited amount of time with a noncustodial parent who has a somewhat lower standard of living than the child does not, ipso facto, mean that *the child's* standard of living is reduced. See *Maturo* v. *Maturo*, 296 Conn. 80, 108, 995 A.2d 1 (2010). Moreover, the defendant concedes that, as a *noncustodial* parent, he would not be entitled to a child support award under any circumstances. As we stated in *Tomlinson* v. *Tomlinson*, 305 Conn. 539, 46 A.3d 112 (2012), "the legislature viewed the provision of custody as the premise underlying the receipt of child support payments; the legislature did not envision that the custodian would be required to pay child support to a person who does not have custody, as well as (in cases in which the obligor obtains custody) expend resources to provide directly for the care and welfare of the child. In fact, under the Child Support and Arrearage Guidelines . . . child support award is defined as the entire payment obligation of the *noncustodial* parent . . . ."[18] (Emphasis in original; internal quotation marks omitted.) Id., 554.

The defendant also appears to claim that, for the sake of the children, *he* is entitled to enjoy his predissolution standard of living because an "extraordinary disparity in parental income may hinder [the] lower income [noncustodial] parent's ability to foster a relationship with the child . . . ." (Internal quotation marks omitted.) See *Maturo* v. *Maturo*, supra, 296 Conn. 101. Again, we are not persuaded. This court recognized in *Maturo* that, when there is an "extraordinary disparity" in parental income, the court may depart from the child support guidelines when the custodial parent has the higher income and deviation from the presumptive support amount "would enhance the lower income [noncustodial] parent's ability to foster a relationship with the child . . . ." (Internal quotation marks omitted.) Id.; see also Regs., Conn. State Agencies § 46b-215a-5c (b) (6) (B) (when there is extraordinary disparity between parents' net incomes, court may deviate from presumptive support amounts if deviation would "enhance the lower income parent's ability to foster a relationship with the child" and "sufficient funds remain for the parent receiving support to meet the basic needs of the child after deviation"). In other words, *Maturo* recognized that a lower income noncustodial parent may be permitted to *pay less* than the presumptive child support amount to a higher income custodial parent if there is an extraordinary disparity in their incomes and the other conditions of the regulation are met—relief that

the defendant in the present case did not seek. Thus, although § 46b-215a-5c (b) (6) (B) admittedly was intended to address the problems that may arise when divorced parents have disparate incomes and standards of living, the remedy that it provides is quite limited. *Maturo* does not suggest that a lower income noncustodial parent has any right under the regulation to *receive* child support from a higher income custodial parent for the purpose of enhancing the ability of the noncustodial parent to "foster a relationship" with a child who shares the custodial parent's higher standard of living. Cf. *Zheng* v. *Xia*, 204 Conn. App. 302, 312, 253 A.3d 69 (2021) (under *Maturo*, trial court *improperly* ordered parent with higher income to pay supplemental, lump sum child support to custodial parent with no income other than child support on basis of "significant disparity" in parties' income). In *Maturo*, the court recognized that, "[w]hen a parent has an ability to pay a large amount of support, the determination of a child's needs can be generous, but all any parent should be required to pay, regardless of his or her ability, is a fair share of the amount *actually necessary* to maintain the *child* in a reasonable standard of living. Court-ordered support that is more than reasonably needed for the child becomes, in fact, [tax free] alimony." *Maturo* v. *Maturo*, supra, 105–106. (Emphasis altered; internal quotation marks omitted.) Indeed, as we have already explained, a *noncustodial* parent is not entitled to a child support award under any circumstances. See *Tomlinson* v. *Tomlinson*, supra, 305 Conn. 554.

The defendant contends that the fact that a noncustodial parent cannot receive child support *supports* his argument that the prenuptial agreement is unconscionable because it demonstrates that, if the agreement is enforced, the trial court will be "without the tools to account properly *for the best interests of* [*the*] *children*, putting both the noncustodial parent and them in an untenable place." (Emphasis added.) Thus, the defendant appears to suggest that, in the absence of the prenuptial agreement, the trial court would be authorized to award alimony or a property distribution to him for the purpose of ensuring that he can provide for the *children* in the same manner as the plaintiff. This court has held, however, that it is improper to disguise a child support award as alimony, and that alimony should be used only to address the needs of the recipient parent.[19] See *Loughlin* v. *Loughlin*, 280 Conn. 632, 655, 910 A.2d 963 (2006). Moreover, we observed in *Tomlinson* v. *Tomlinson*, supra, 305 Conn. 555, that "permitting the diversion of funds away from the [custodial] parent [who is] providing for the care and well-being of minor children . . . would contravene the purpose of child support." Although we were referring in *Tomlinson* to a situation in which a former noncustodial parent takes custody of the children and becomes responsible for supporting them but continues to pay child support to

the former custodial parent; see id., 541–42; the same principle would hold true whenever a custodial parent is required to pay any form of support to a noncustodial parent based on the fiction that the payment is for the support of the *children*.[20]

In short, we see nothing in our statutes or case law to suggest that it is the public policy of this state that a noncustodial parent is entitled to receive any form of postdissolution support for the sole purpose of ensuring that he or she has the ability to provide for the children of the marriage in the same manner as the custodial parent.[21] Indeed, § 46b-215a-5c (b) (6) (B) of the regulations expressly contemplates that, after a marital dissolution, the parents of a child may have an "[e]xtraordinary disparity" in income. It follows that the regulation contemplates that a child may well have a higher standard of living than his or her noncustodial parent while continuing to have a relationship with that parent. We conclude, therefore, that *Maturo* does not support the proposition that it would be unfair, much less unconscionable, to enforce a prenuptial agreement merely because there is an extraordinary disparity between the incomes or standards of living of the custodial parent and the children, on the one hand, and the noncustodial parent, on the other hand.[22]

The defendant also relies on this court's decision in *Bedrick* v. *Bedrick*, supra, 300 Conn. 691, to support his contention that enforcement of the prenuptial agreement would be unconscionable. In *Bedrick*, the parties executed a postnuptial agreement in 1977, providing that, in the event of a marital dissolution, neither party would receive alimony.[23] Id., 693–94. Instead, the plaintiff wife would receive a cash settlement in an amount to be periodically reviewed. Id., 694. A May 18, 1989 addendum to the agreement provided for a cash settlement in the amount of $75,000. Id. The plaintiff waived her interest in the defendant's car wash business, and the defendant agreed that the plaintiff would not be held liable for his personal and business loans. Id. In the early 1990s, the defendant's car wash business became successful. Id., 707. In 1991, when the parties were forty-one years old, their child was born. Id. By the time of trial, the plaintiff had worked for that business for thirty-five years, providing administrative and book-keeping support. Id. Since 2001, when the business began to deteriorate, the plaintiff had managed all business operations except for maintenance. Id. In 2004, the plaintiff worked outside of the business to provide the family with additional income. Id. The trial court concluded that "[t]he economic circumstances of the parties had changed dramatically since the execution of the agreement and that enforcement of the postnuptial agreement would have worked injustice." (Internal quotation marks omitted.) Id. Accordingly, it concluded that the agreement was unenforceable. Id. This court concluded that "[t]he facts and circumstances . . .

clearly support the findings of the trial court that, as a matter of law, enforcement of the agreement would be unconscionable." Id., 708.

In the present case, the defendant contends that *Bedrick* stands for the proposition that a prenuptial agreement is unenforceable whenever (1) a child was unexpectedly born during the marriage, and (2) a spouse has undergone dramatic economic changes. We conclude that *Bedrick* is easily distinguishable from the present case. First, in *Bedrick*, the plaintiff gave birth to the parties' child after sixteen years of marriage when both parties were forty-one years old. See *Bedrick* v. *Bedrick*, Docket No. FA-07-4007533, 2009 WL 1335100, *4 (Conn. Super. April 24, 2009). By contrast, in the present case, the parties' three children were all born within five years of the marriage, when both parties were in their thirties. Although the children may not have been "contemplated" when the parties executed the prenuptial agreement, it is reasonable to conclude that their births were less of a bolt from the blue than the birth of the parties' child in *Bedrick*. Indeed, when asked at trial whether he and the plaintiff "plan[ned] on having children during the course of the marriage," the defendant replied, "[y]eah." When asked what his plan was, he replied, "[t]o be fruitful and multiply."[24] Second, the plaintiff in *Bedrick* worked for the defendant's car wash business for thirty-five years, including the entire thirty-two year duration of the marriage, often seven days per week. *Bedrick* v. *Bedrick*, supra, 300 Conn. 707; *Bedrick* v. *Bedrick*, supra, 2009 WL 1335100, *3. The business floundered after the dissolution action was instituted and the plaintiff ceased working for it. *Bedrick* v. *Bedrick*, supra, 300 Conn. 707. In the present case, there is no evidence that the defendant contributed to the success of any business or enterprise of the plaintiff. Third, in *Bedrick*, the plaintiff secured employment "outside of the [car wash] business in order to provide the *family* with additional income." (Emphasis added.) Id. Although the defendant in the present case may have contributed to the support of his children during the marriage, there is no evidence that he provided financial support to the plaintiff.[25] Finally, the plaintiff in *Bedrick* was fifty-seven years old at the time of the marital dissolution, did not have a college degree and had been diagnosed with diabetes, which was controlled by medication. *Bedrick* v. *Bedrick*, supra, 2009 WL 1335100, *3–4. In the present case, the defendant was forty-four years old at the time of dissolution, had a college degree and was in good health.

We further note that the defendant had significant assets at the time of the marital dissolution and is adequately provided for, at least in the near term. Although we recognize that his assets may not be sufficient to meet his needs for his entire lifetime, nothing in the record would support a conclusion that he is incapable of earning an income.[26] To the contrary, the evidence

showed that the defendant was an educated, healthy forty-four year old with some business experience, and he testified at trial that, once he expended his assets, he was "going to have to hustle and figure some things out, get . . . some salaried or . . . contract work . . . and hope that what [he's] been working on for the last three years will come to fruition down in the . . . Virgin Islands." In addition, the defendant's counsel admitted to the trial court that the defendant "is intelligent, he is healthy, and he is capable of working." Accordingly, we cannot conclude that it would be unconscionable to expect the defendant to obtain employment to replace the unexpected loss of his income from Intermountain Industries.[27] Indeed, if we were to conclude otherwise, an employed person who entered into a prenuptial agreement and, after the marriage, lost his or her job could simply refuse to seek employment and then claim that his or her lack of employment was a dramatic change in circumstances warranting invalidation of the agreement.

Moreover, there is no evidence that the defendant, unforeseeably or otherwise, gave up any income earning or asset building opportunities as a result of his marriage or the births of the children, or that he made significant and ongoing contributions to family life, such as shopping, doing household chores, entertaining the plaintiff's associates and family, or caring for the children, for which it would be unfair, much less unconscionable, not to compensate him. Cf. *Hornung* v. *Hornung*, supra, 323 Conn. 163 ("[b]ecause the plaintiff's efforts as a homemaker and the primary caretaker of the children increased the defendant's earning capacity at the expense of her own, she is entitled to [an alimony award that will allow her to] maintain [her high predissolution] standard of living after the divorce, to the extent possible"). To the contrary, the trial court found that the defendant "did not make the plaintiff or the children even a remote priority in his life." We conclude, therefore, that the trial court correctly determined that enforcement of the prenuptial agreement in the present case would not be unconscionable in light of all of the relevant facts and circumstances.

Finally, the defendant contends that it was inconsistent for the trial court to conclude that it would be unconscionable to enforce the provision of the prenuptial agreement requiring a party who unsuccessfully seeks to invalidate any portion of it to pay the attorney's fees of the other party but not unconscionable to enforce the remainder of the agreement. We disagree. Significantly, the prenuptial agreement contained a severability clause that expressly contemplated that, if one or more of its terms were found to be invalid, the rest of the agreement would survive. See A. Rutkin et al., 8A Connecticut Practice Series: Family Law and Practice with Forms (3d Ed. 2010) § 50.53, p. 256; cf. *Venture Partners, Ltd.* v. *Synapse Technologies, Inc.*, 42 Conn.

App. 109, 118, 679 A.2d 372 (1996) (discussing principles of severability under Connecticut contract law). In sister states that, like Connecticut, have premarital agreement statutes like § 46b-36g that are modeled after the Uniform Premarital Agreement Act; see, e.g., *Friezo* v. *Friezo*, supra, 281 Conn. 183–84; the presence of a severability clause renders enforceable the remainder of a prenuptial agreement that contains a provision that is unconscionable or invalid as a matter of law. See, e.g., *In re Marriage of Heinrich*, 7 N.E.3d 889, 906 (Ill. App. 2014) (concluding that severability clause left "remainder of the agreement . . . unaffected by [court's] holding" that agreement's "[attorney fee shifting] ban as to [child related] issues violates [Illinois] public policy and is unenforceable" as to those issues); *Sanford* v. *Sanford*, 694 N.W.2d 283, 293 (S.D. 2005) (emphasizing presence of savings clause in concluding that "[p]rovisions in a prenuptial agreement purporting to limit or waive spousal support are void and unenforceable as they are contrary to public policy, and [that they] may be severed from valid portions of the prenuptial agreement without invalidating the entire agreement"); cf. *Rivera* v. *Rivera*, 149 N.M. 66, 72–73, 243 P.3d 1148 (N.M. App.) (premarital agreement was unenforceable because it contained provision waiving right to seek spousal or child support in violation of state statute, and "agreement [did] not contain a severability clause, and [w]ife [made] no argument that the remainder of the agreement should not be affected by the invalidity of the support provisions"), cert. denied, 149 N.M. 64, 243 P.3d 1146 (2010). Accordingly, the trial court did not act inconsistently as a matter of law in concluding that the effect of enforcing the attorney's fees provision was unconscionable because it would "financially cripple" the defendant, while also finding that the remainder of the agreement was enforceable. Because enforcement of the remainder of the agreement would, as we explained, leave the defendant with significant assets sufficient to provide for his needs until he can obtain a source of income, the trial court properly allowed the parties the benefit of the bargain to which they had agreed before their marriage.

The judgment is affirmed.

In this opinion the other justices concurred.

* November 17, 2021, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] General Statutes § 46b-36g provides in relevant part: "(a) A premarital agreement or amendment shall not be enforceable if the party against whom enforcement is sought proves that:

* * *

"(2) The agreement was unconscionable when it was executed or when enforcement is sought;

* * *

"(c) An issue of unconscionability of a premarital agreement shall be decided by the court as a matter of law."

[2] The defendant appealed to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[3] Financial disclosures attached to the prenuptial agreement indicated

that the value of the defendant's assets at the time of the marriage was $13,267,952.81. It was discovered during the dissolution proceedings that this figure had been established by using generally accepted accounting practices, rather than fair market value, and that the fair market value of the assets was $5,150,295.

[4] Intermountain Industries was an oil and gas exploration business in which the defendant's father had a controlling interest. Intermountain Industries made dividend payments to an entity known as Century American, which, in turn, made guaranteed payments to 4H, LLC, the members of which were the defendant's father and his lineal descendants, including the defendant.

[5] The trial court made no findings in connection with the defendant's claim at trial that the prenuptial agreement was unconscionable when the parties executed it, and the defendant does not pursue that claim on appeal.

[6] Specifically, the financial affidavit indicated that he had a weekly income of $2 from dividends and interest payments.

[7] In determining this amount, the trial court relied on a child support guidelines worksheet dated February 12, 2019, in which the plaintiff stipulated that she received $48,361 in gross weekly income and mandatory deductions of $14,077, for a net weekly income of $34,284. The plaintiff submitted a subsequent financial affidavit to the trial court dated February 20, 2019, indicating that her net weekly income was $24,505. This figure appears to have been a clerical error, as the same affidavit indicates that her gross weekly income was $48,361, and mandatory deductions were $14,491, which would yield a net weekly income of $33,870.

[8] The parties stipulated that, for child support purposes only, the defendant had a gross weekly income of $3720 and a net weekly income of $2569.

[9] The trial court made no finding on the issue, but the undisputed evidence showed that the defendant had liabilities of $1.35 million, yielding a net worth of approximately $750,000.

[10] The trial court stated that, "[a]lthough the defendant was not financially crippled after his home burned down, the Yacht Club was underinsured, and the insurance proceeds could not fully restore the property to its prior form. In addition to the defendant's financial losses from these unforeseen events, he was no longer able to generate revenue from the Yacht Club after it was destroyed, significantly diminishing his assets."

[11] Evidence presented at trial showed that the plaintiff had paid attorney's fees in the amount of $1,559,713.17 defending against the defendant's cross complaint seeking invalidation of the prenuptial agreement.

[12] After this appeal was filed, the plaintiff filed a motion for leave to file a late conditional cross appeal in which she requested permission to cross appeal from the trial court's ruling invalidating the attorney's fees provision in the event that the Appellate Court reversed the judgment and remanded the case to the trial court for a new trial without resolving the issue of the enforceability of the prenuptial agreement. The Appellate Court denied the motion, and this claim is not before us.

[13] The defendant also claims that the trial court improperly precluded him from soliciting testimony as to whether the parties contemplated certain events when they entered into the prenuptial agreement. Because we conclude that enforcement of the agreement is not unconscionable, even assuming that the events at issue were not contemplated by the parties, we need not address this claim.

[14] The plaintiff also contends, essentially as an alternative ground for affirmance, that the trial court incorrectly determined that the parties did not contemplate that they would have children, that the defendant's house would be destroyed by fire, that the Yacht Club would be destroyed by a hurricane and that Intermountain Industries would fail. There appear to be two separate bases for this claim. First, the plaintiff appears to contend that these events were contemplated by the parties *as a matter of law* because the prenuptial agreement expressly provided that "[n]o change in circumstances of the parties shall render [the] [a]greement unconscionable if enforcement hereof is sought at any time in the future." Second, the plaintiff claims that these events were, as a factual matter, within the contemplation of the parties. We are doubtful, however, whether a "no change in circumstance" provision could save a prenuptial agreement that otherwise would be unenforceable as unconscionable. We need not resolve these issues here, however, because we conclude that the trial court correctly determined that the existence of these uncontemplated events did not render the enforcement of the prenuptial agreement unconscionable.

[15] *Bedrick* involved the enforceability of a postnuptial agreement. See

*Bedrick* v. *Bedrick*, supra, 300 Conn. 693. The same principle, however, applies to prenuptial agreements. See id., 696–97; *Crews* v. *Crews*, supra, 295 Conn. 167 ("equitable considerations codified in our statutes . . . have no bearing on whether [a prenuptial] agreement should be enforced" (internal quotation marks omitted)).

[16] As we indicated; see footnote 14 of this opinion; we need not address the plaintiff's challenge to the trial court's factual findings on these issues because, even assuming that, contrary to the plaintiff's claim, the findings were correct, we agree with the trial court's legal conclusion that those facts did not render the prenuptial agreement unconscionable.

[17] The defendant testified at trial that, since the dissolution action was brought, he has paid rent of $3500 per month for a 983 square foot, three bedroom house in the Rowayton neighborhood of Norwalk. He further testified that the house has a garage that he has converted into a playroom, laundry room, workshop and storage area.

[18] See Regs., Conn. State Agencies § 46b-215a-1 (6). The current version of the child support guidelines recognizes that there has been "a trend away from 'custodial/noncustodial' and 'visitation' language toward the concept of shared parenting." Child Support and Arrearage Guidelines (2015), preamble, § (g), p. xii. The guidelines also recognize that, "within the context of shared physical custody, both parents are essentially custodial." Id. When that is the case, the guidelines provide that "the most practical approach [is] for [child support] to be paid by the parent with the higher income." Id. As we have indicated, in the present case, the plaintiff has primary physical custody of the children, and the defendant has made no claim that he is entitled to child support on the ground that the parties have shared custody. To the contrary, he agreed to pay child support to the plaintiff and concedes that he is not entitled to receive child support from her.

[19] We note that there is considerable overlap between the factors that the trial court must consider when crafting an alimony award pursuant to General Statutes § 46b-82 and the factors that it must consider when assigning property pursuant to General Statutes § 46b-81. Neither statute authorizes the court to consider the ability of a spouse to support his or her children, and the defendant has cited no authority for the proposition that, unlike an alimony award, it is proper to assign property for that purpose.

[20] The court in *Melrod* v. *Melrod*, 83 Md. App. 180, 574 A.2d 1, cert. denied, 321 Md. 67, 580 A.2d 1077 (1990), observed that the failure to award an indefinite award of alimony to the plaintiff wife might be unconscionable because "it could not help but have some effect upon the child to go back and forth between a father who can afford to live in luxury and a mother who is required to exercise some degree of frugality." Id., 197. *Melrod* involved a Maryland statute providing that a court may award alimony for an indefinite period if the court finds that, "even after the party seeking alimony will have made as much progress toward becoming self-supporting as can reasonably be expected, the respective standards of living of the parties will be unconscionably disparate." Md. Code Ann., Fam. Law § 11-106 (c) (2) (1984); see *Melrod* v. *Melrod*, supra, 196. Connecticut has no such statute, and, as we explained, alimony may not be used in this state to disguise child support. Although we recognize that it may be difficult for some children under some circumstances to grapple with the fact that their parents have disparate standards of living, we do not agree with the court in *Melrod* to the extent that it concluded that it is *unconscionable* to permit a child who enjoys the same high standard of living that he or she did before the dissolution to have a relationship with a parent who lives in a somewhat more modest manner. Indeed, spending time with a less affluent parent could be just as beneficial to a child as time spent with an affluent parent.

[21] As we indicated, if the parents have *shared* physical custody of the children, the parent with the lower income can make a claim for child support. See footnote 18 of this opinion. That is not the case here. If the legislature believes there is a gap in the statutory scheme governing marital dissolutions and financial awards in this regard, it is free to address that gap legislatively. It is not the role of this court to create public policy in this highly regulated area.

[22] In such a situation, the fact that the lower income noncustodial parent is unable to provide for *himself* in the same manner as when the prenuptial agreement was executed may, depending on all of the relevant facts and circumstances, justify invalidating the agreement and awarding alimony *on that ground*. See footnote 27 of this opinion. We are aware of no authority, however, for the proposition that a noncustodial parent who otherwise would not be entitled to alimony would be entitled to it solely on the basis

of his "need" to provide for his *children* in the same manner as the custodial parent. See, e.g., *Loughlin* v. *Loughlin*, supra, 280 Conn. 655 (it is improper to disguise child support as alimony).

[23] This court concluded in *Bedrick* that postnuptial agreements are subject to stricter scrutiny than prenuptial agreements when a court is determining whether they are enforceable at the time of execution. *Bedrick* v. *Bedrick*, supra, 300 Conn. 703–704. Specifically, unlike prenuptial agreements, postnuptial agreements "are subject to special scrutiny and the terms of such agreements must be both fair and equitable at the time of execution . . . ." Id., 697. Courts apply the same standard, however, when determining whether postnuptial and prenuptial agreements are enforceable at the time of enforcement, namely, whether the agreement was unconscionable. Id., 704.

[24] The defendant suggests that this testimony related to his expectations *during the marriage*, not at the time that he executed the prenuptial agreement. As we have indicated, we assume, without deciding, that the trial court correctly determined that the parties did not "contemplate" having three children when the agreement was executed. As we have also suggested, however, the question of whether an event was "contemplated" is not a black and white one but involves shades of gray. Although the parties may not have "contemplated" having three daughters within five years of the marriage in the sense that they did not expressly discuss the matter and had no specific plan when they entered into the agreement shortly before the marriage, it seems highly implausible that they had a conscious plan to have *no* children at that time but that several months after the marriage when the plaintiff became pregnant, the defendant suddenly developed a plan to "be fruitful and multiply." We conclude, therefore, that, even if the births of the three children were not contemplated when the agreement was executed, in the sense that the births were not consciously and explicitly planned, they were not so completely beyond or contrary to expectation that enforcement of the agreement would work an injustice. See *McHugh* v. *McHugh*, supra, 181 Conn. 489.

[25] The defendant points out that, after the marriage, the parties lived in the defendant's house, "where he paid the carrying costs," until it was destroyed in the fire. They then leased another house using insurance proceeds. The evidence also showed, however, that the plaintiff provided approximately 75 percent of the furnishings for the defendant's house, for which she received insurance compensation, and she spent $50,000 to $60,000 on improvements to the defendant's property, for which she never made any claim. The trial court made no finding as to whether the evidence that the plaintiff lived in the defendant's house supported the conclusion that the defendant provided financial support to the plaintiff, and we conclude that the evidence does not compel the conclusion that he did. The only finding that the trial court made on this issue was that "[t]he parties kept their money separate and devoted vastly different amounts of effort and respect into their marriage . . . . Instead of trying to provide for the plaintiff and their young children, the defendant remained stagnant and engulfed in a selfish mentality until he lost his footing in his business and his marriage."

[26] The defendant contends that this court is precluded from considering his ability to provide for himself because the trial court did not expressly specify his earning capacity. See, e.g., *Tanzman* v. *Meurer*, 309 Conn. 105, 117, 70 A.3d 13 (2013) (trial court must specify dollar amount of party's earning capacity when that factor provides basis for financial award because failure to do so "leaves the relevant party in doubt as to what is expected from him or her, and makes it extremely difficult, if not impossible, both for a reviewing court to determine the reasonableness of the financial award and for the trial court in a subsequent proceeding on a motion for modification to determine whether there has been a substantial change in circumstances"). The defendant fails to recognize that the trial court in the present case was not determining the amount of a financial award pursuant to § 46b-82 (a) and General Statutes § 46b-86, as in *Tanzman*, but was determining whether enforcement of the prenuptial agreement would be unconscionable under § 46b-36g (a) (2) in light of all of the relevant facts and circumstances. The defendant bore the heavy burden of proving an extraordinary change in circumstances to prevail on that issue. See, e.g., *Crews* v. *Crews*, supra, 295 Conn. 169. The defendant has pointed to no evidence that would support a finding that, as of the date of the dissolution, he was no longer capable of earning an income, and he made no such claim to the trial court or on appeal.

[27] The defendant's counsel contended at oral argument before this court

that the defendant should not be required to establish that he will be unable to provide for his basic needs before the enforcement of the prenuptial agreement can be found to be unconscionable under § 46b-36g (a) (2), because such an interpretation of that statute would render § 46b-36g (b) superfluous. See General Statutes § 46b-36g (b) ("[i]f a provision of a premarital agreement modifies or eliminates spousal support and such modification or elimination causes one party to the agreement to be eligible for support under a program of public assistance at the time of separation or marital dissolution, a court, notwithstanding the terms of the agreement, may require the other party to provide support to the extent necessary to avoid such eligibility"). We agree with the defendant that there may be circumstances in which the enforcement of a prenuptial agreement would be unconscionable even though the party seeking to invalidate the agreement would be able to provide for his or her basic needs if the agreement were to be enforced. Cf. *Bevilacqua* v. *Bevilacqua*, 201 Conn. App. 261, 273–74, 242 A.3d 542 (2020) (trial court correctly concluded that enforcement of prenuptial agreement would be unconscionable when "there was evidence in the record that [a motor vehicle accident resulting in a mild traumatic brain injury] impaired the plaintiff's ability to work full-time, and, as a result, she was forced to obtain part-time employment at a salary far lower than the one she earned at the time the agreement was executed"). That does not mean that the question of whether the party seeking to invalidate the agreement will be able to provide for his or her basic needs if the agreement is enforced is always irrelevant to the determination of whether enforcement would be unconscionable. Indeed, there may be cases in which, under all of the relevant facts and circumstances, the enforcement of a prenuptial agreement would not be unconscionable despite a significant reduction in the income of the party seeking invalidation, provided that the court finds that the party can still provide for his or her basic needs. We need not resolve that issue in the present case, however, because the defendant presented *no* evidence that he is no longer capable of earning an income comparable to the income that he was earning when he executed the prenuptial agreement. See footnote 26 of this opinion.

———————————————————